UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 19-060 |
| VERSUS | SECTION "D" |
| | JUDGE WENDY VITTER |
| IMAD FAIEZ HAMDAN a/k/a Eddie | |
| ZIAD ODEH MOUSA a/k/a Z | MAGISTRATE (4) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
COUNTS 2 THROUGH 72 OF INDICTMENT; RULE 12(b)**

**MAY IT PLEASE THE COURT:**

Counts 2 through 72 of the Indictment alleging a conspiracy to defraud the United States, (Count 2), and failure to withhold and pay over employment taxes, (Counts 3 – 50), and aiding in the preparation of others' false tax returns, (Counts 51 – 72), are completely undermined by the fact that Mr. Hamdan overpaid his personal income taxes to such a considerable extent that the federal government actually owes him money, due to an offset and credit per statutory law and equity. Brothers Petroleum accounted for salaries and bonuses paid in cash as a distributions to Mr. Hamdan, who in turn paid taxes on the distributions at his much higher individual tax rate, resulting in a substantial overpayment to the government. It is this "central management system" by Mr. Hamdan and Mr. Mousa that the government alleges constitutes a conspiracy to defraud the United States. The government has thereby received an inequitable and unfair windfall, and caused Mr. Hamdan and Mr. Mousa substantial loss. Under these circumstances, the government cannot establish the requisite criminal intent in any of Counts 2 through 72, and any violations of law and proof of statutory elements, because of the overpayment and corresponding credit offset, and amount due back to Mr. Hamdan. The government must be estopped from claiming Mr. Hamdan and Mr. Mousa owe taxes to the government. The government cannot as a matter of law

prove the essential elements of the tax offenses charged, and, as a result, Counts 2 through 72 must be dismissed.

## FACTS & ALLEGATIONS

### I.     The Indictment: Counts 2 Through 72

The Indictment alleges that Mr. Hamdan and Mr. Mousa owned and operated more than thirty food stores, convenience stores, and gas stations that operated under the name "Brothers Food Mart" in the State of Louisiana. (Rec. Doc. #1, Page 1-2), and operated all of the Brothers Food Mart locations - each specific business entities - under a central management system. (*Id*., at Page 2).  "The books and records for each store were created and maintained" at the company's central offices in Gretna and Harvey, *id.*, by the company's bookkeeper, who was responsible for accounting for cash payments to managers and other employees.

Count 2 entitled, "Conspiracy to Defraud the United States," alleges that, beginning at a time unknown to the Grand Jury, but not later than July 2009, and continuing through December 2015, Mr. Hamdan and Mr. Mousa "unlawfully, voluntarily, intentionally, and knowingly did conspire, combine, confederate, and agree together and with each other to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the IRS in the ascertainment, computation, assessment, and collection of federal income taxes and employment taxes." (Rec. Doc. #1, Page 8).  The Indictment further alleges "the purpose and object of the conspiracy was for the defendants and co-conspirators to unjustly enrich themselves and others by under-reporting wages paid to employees of Brothers Food Mart and to avoid the assessment and payment of employment taxes…" (*Id*., at Page 9) (emphasis added).  As manner and means to carry out this alleged conspiracy, the Government claims Mr. Hamdan and Mr. Mousa hired managers to operate various locations of Brothers Food Mart and paid part of

their salaries in cash, which payments were not reported.  It is further alleged that Mr. Hamdan and Mr. Mousa directed those managers to hire undocumented workers, who were also paid in cash and, likewise, those payments were not reported.  (*Id*., at Pages 8-9).

Substantive Counts 3 through 50, entitled, "Failure to Withhold, Account for, and Pay Over," allege that from the first quarter of 2012, through the fourth quarter of 2013, Mr. Hamdan and Mr. Mousa "did willfully fail to truthfully account for, collect, and pay over to the IRS the following trust fund taxes due and owing to the United States of America on behalf of the employees of Brothers Food Mart entity for each quarter…with each calendar quarter constituting a separate count of this Indictment..." (*Id.*, ¶55.)

Substantive Counts 51 through 72, allege that Mr. Hamdan and Mr. Mousa "did willfully aid and assist in, and procure, counsel and advise the preparation and presentation to the IRS U.S. Individual Income Tax Returns, IRS Forms 1040 and 1040A...which tax returns were false and fraudulent as to material matters…" (*Id.*, ¶57.)  It is assumed that the taxpayers in these counts were store managers.

## II.  Defendants' Overpayment of Income Taxes

Accepting as true, for purpose of the motion, the allegations in the Indictment and that Mr. Hamdan and Mr. Mousa owned and operated certain of the Brothers Food Mart locations under a central management system, statutory law, fundamental fairness and equity require a consideration of Mr. Hamdan's whole tax accounting picture during the tax years in the Indictment.

Defendants have been seeking discovery from the government of the pertinent amounts of underpayment of employment and income taxes, for purposes of the Count 2 conspiracy to defeat taxes, the substantive failure to collect and pay such employment taxes, Counts 3-50, and the substantive aiding and assisting in the false returns and underpayment of income taxes by

managers of the companies, as well as discovery on any government evidence or calculation for the corresponding amount of overpayment by Mr. Hamdan on his personal income taxes. This discovery has not been concluded and is ongoing. Until there is definitive production, discovery and calculation of these amounts, the following facts are not in dispute and have been partially provided to the government, as follows.

It is an accounting fact that, for the years 2009 – 2014, Mr. Hamdan <u>overpaid</u> his federal income taxes in the gross amount of <u>$5,222,675</u>. The government has not provided any discovery or evidence that this amount is incorrect. Prior to the Indictment, in a letter, dated September 4, 2018, the government claimed that the amount of tax <u>underpayment</u> or loss was <u>$3,419,539</u>. Consequently, and contrary to the theory of the government's case, the net result is that Mr. Hamdan overpaid his federal income taxes, on his Form 1040 for the years in the Indictment. By operation of law, Mr. Hamdan is owed a $5,222,675, offset and credit, and <u>net pay back</u> of <u>$1,803.136</u>, for overpayment of personal income taxes. In effect, by filing company LLC's and pass-through returns and Mr. Hamdan's 1040 returns, as actually done, Mr. Hamdan paid to the government $1,803,136 <u>more</u> than he underpaid or did not collect, account and pay over for employment taxes, FICA, and the amounts of false returns in Counts 51 – 72. Thus, even if the charged conduct involves a tax loss of $3,419,539 related to the failure to collect and pay over employment taxes, as the government has alleged, after offset and credit, the Internal Revenue Service still owes Mr. Hamdan more than $1.8 million. This net overpayment was based on the highest tax rates for certain low-income employees, so the overpayment would be even more if their expected filing status of married and/or with dependents been used. Again, the government has not provided any discovery or evidence contrary to these calculations.

## AUTHORITIES

I.    **Setoff Occurs By Operation of Law and Shields Defendants From All Criminal Responsibility in Counts 2 Through 72**

In the case of any overpayment of tax, 26 U.S.C. § 6402, authorizes the IRS to apply the amount of any tax overpayment to a number of taxpayer obligations, and requires the IRS, subject to certain exceptions, to credit and offset any balance due by the person who made the tax overpayment.  Specifically, Part (a) of that statute, entitled "Authority to make credits or refunds", provides, in pertinent part:

> **(a) General rule.**--In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and ***shall, subject to subsections (c), (d), (e), and (f), refund any balance to such person.*** (Emphasis added.)

Subsections (c), (d), (e), and (f) enumerate the various taxpayer obligations that may be offset by an overpayment and provide guidelines and restrictions for doing so, which do not restrict Mr. Hamdan's and Mr. Mousa's rights to claim setoff in this case. Taking those subsections together with subsection (a), it is clear the IRS can apply the amount of any overpayment (and interest due thereon) to the following taxpayer obligations, including:

1. *the taxpayer's federal tax liability*;[1]
2. any past due support;[2]
3. *the collection of debts owed to federal agencies*;[3]
4. past due and enforceable state income tax obligations.[4] (Emphasis added.)

---

[1] 26 U.S.C. § 6402 (a).

[2] 26 U.S.C. § 6402 (c) support is defined by reference to section 464(c) of the Social Security Act.

[3] 26 U.S.C. § 6402 (d);26 U.S.C. § 6402(g) Federal agency.—For purposes of this section, the term "Federal agency" means a department, agency, or instrumentality of the United States, and includes a Government corporation (as such term is defined in section 103 of Title 5, United States Code).

[4] 26 U.S.C. § 6402 (e)

Applying Subsection (a) of Section 6402 to the instant case, the Secretary must credit Mr. Hamdan's overpayment against the alleged tax liability in the Indictment, and reduce it to zero dollars.  Even after doing so, there would be a balance due back to Mr. Hamdan.  According to the face of this statute, the credit or offset executes by operation of law and equity, whether or not Mr. Hamdan claims a refund under 26 U.S.C. 6511.  There is no condition or requirement in this statute that the taxpayer must file for a refund under 26 U.S.C. 6511, in order to receive a credit or offset.  Further, the definition of "overpayment," in 26 U.S.C. 6401, specifies that it includes "the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto," and for application under 26 U.S.C. 6402, and would include the equitable balancing for credits and offsets after any period to collect refunds.

Even if Mr. Hamdan were to file a claim for refund under 26 U.S.C. 6511, his claim would nonetheless be timely, at least for tax periods 2012 and 2014 (Mr. Hamdan did not overpay in 2013) and possibly even 2011 as well.  The period of limitations for filing a claim for refund, under 26 U.S.C. § 6511, is three years from the time the return was filed or two years from the time the tax was paid, whichever of such periods expires later. 26 U.S.C. § 6511(a).  Mr. Hamdan filed his tax returns for 2012 and 2014 on October 15, 2013 and October 15, 2015, respectively. Subsequently, Mr. Hamdan, through his CPA, provided informal notice to the IRS of all overpayments from 2009 through 2014, including those in 2012 and 2014, when his CPA met with IRS agents in November 2015.  This initial meeting commenced a series of subsequent meetings and discussions in which the IRS investigated, and Mr. Hamdan's CPA corroborated, the existence, amount, and nature of Mr. Hamdan's overpayments of income taxes during those years. The November 2015 meeting with IRS agents is well within the three-year limitations period that commenced with the filings of Mr. Hamdan's 2012 tax return on October 15, 2013 and 2014 tax

return on October 15, 2015. The Fifth Circuit has recognized that such informal communications are sufficient to interrupt the three year period of limitations for claiming refunds under Section 6511.[5] Even assuming for the sake of argument that an offset claim for 2011 would not be timely, Mr. Hamdan's income tax overpayments in 2012 and 2014, and the resulting statutory offsets, are more than sufficient to satisfy and extinguish any employment tax debt that Brothers Petroleum might owe under Counts 2 through 72. All offsets from 2011 through 2014 occurred by operation of law, pursuant to 26 U.S.C. § 6402, as discussed above, and as will be discussed further below, Mr. Hamdan and Mr. Mousa are also entitled to raise setoff as a defense under principles of equity, unjust enrichment and fundamental fairness, none of which have any applicable period of limitations.

Following the November 2015 meeting, agents and Counsel for Mr. Hamdan, on numerous occasions, by letter and in discussions with the government, notified the government of the above overpayment, and amount of credits and offsets due as a result thereof, as against taxes claimed by the government, and provided an expert witness and evidence in support. The government has never shown that the information and calculations were inaccurate. According to the government's

---

[5] In *PALA, Inc. Employees Profit Sharing Plan & Tr. Agreement v. United States*, 234 F.3d 873, 877 (5th Cir. 2000), the Fifth Circuit noted that oral communications may constitute an "informal claim" sufficient to interrupt the three year period of limitations under Section 6511, providing:

> … the informal claim doctrine has received the endorsement of the Supreme Court.[Citations Omitted] *According to this doctrine, an informal claim is sufficient if it is filed within the statutory period, puts the IRS on notice that the taxpayer believes an erroneous tax has been assessed, and describes the tax and year with sufficient particularity to allow the IRS to undertake an investigation.[Citations omitted] Although an informal claim may include oral communications, it must have a written component.[Citations omitted].* There are no "hard and fast rules" for determining the sufficiency of an informal claim, and each case must be decided on its own facts " 'with a view towards determining whether under those facts the Commissioner knew, or should have known, that a claim was being made.' [Citations omitted]. (Emphasis added).

In the instant case, as explained herein, there were both oral communications (i.e. meetings between the Mr. Hamdan's agents/counsel and the IRS) as well as written documents exchanged between the parties (*i.e.* tax returns, schedules, demand letters, etc.)

said formal demand letter, dated September 4, 2018, and apparently well before, the government believed that Mr. Hamdan owed criminal tax losses in the amount of $3,419,539, for violation of 18 U.S.C. 371, which is clear notice on the part of the government that it believed the tax debt was owed. At that point, according to 26 U.S.C. 6402(d), the government had an obligation to apply the overpayment to the amount the government claimed was due, $3,419,539, and "reduce the amount of any overpayment payable to" Mr. Hamdan, thereby satisfying the alleged debt to the government, $3,419,539, and even more so.  26 U.S.C. 6402(d), thus, mandates that the Secretary of the Treasury offset federal debt owed to federal agencies, *e.g.* the IRS, and then notify the taxpayer of the offset.  This subsection requires the IRS to take these steps "<u>upon receiving notice from any Federal agency that a named person owes a past-due legally enforceable debt.</u>"  Applying concurrently, Subsection (a) of 31 U.S.C. § 3720A(a), provides:

> <u>*Any Federal agency [the IRS] that is owed by a person a past-due, legally enforceable debt [$3,419,539.00] (including debt administered by a third party acting as an agent for the Federal Government) shall*</u>, and any agency subject to section 9 of the Act of May 18, 1933 (16 U.S.C. 831h), owed such a debt may, in accordance with regulations issued pursuant to subsections (b) and (d), <u>*notify the Secretary of the Treasury at least once each year of the amount of such debt.*</u> (Emphasis added.)

Read together, 26 U.S.C. 6402(d) and 31 U.S.C. § 3720A(a)**,** mandate that the IRS, as a federal agency according to the Indictment (Paragraph 17 of Rec. Doc. #1), notify the Secretary of the Treasury every year of the amount allegedly owed by the Mr. Hamdan and Mr. Mousa in employment taxes.  And, upon receiving such notice, the Secretary of Treasury must reduce that underpayment by the overpayment in income taxes, or, conversely, the overpayment by the underpayment.  If those steps were carried out, as required, the government would owe Mr. Hamdan a refund of any balance remaining, pursuant to 26 U.S.C. 6402(a), which, in this case, is $1,803,136, by operation of law.

In short, once the IRS became aware of the tax allegedly due by Mr. Hamdan, which it had been for multiple years, and an overpayment was claimed, it was obligated to apply the overpayment against the underpayment, or debt, but not keep the balance, as it is doing, which would be unfair. The IRS was obligated to refund any balance owed to Mr. Hamdan, rather than keep that amount as it continues to do.  There is no requirement in this statute that Mr. Hamdan must have first applied for a credit or refund under 26 U.S.C. 6511, and within the time limitations therein, although, as discussed above, that time period was interrupted in November, 2015.

There are numerous cases in which federal courts recognized the operation of these principles and, specifically, wherein the IRS applied overpayments to outstanding tax liabilities and assessed tax penalties, over the objections of taxpayers.[6] The court in *In re Shortt*, 277 B.R. 683, 690–91 (Bankr. N.D. Tex. 2002), explained that "all agencies of the federal government are treated as <u>a single entity</u> for purposes of setoff."[7]  Although *In re Shortt* occurred in the bankruptcy context, as the Ninth Circuit noted:

> "[t]he Supreme Court clearly adopted *the unitary setoff rule* for government agencies *in the nonbankruptcy context* in *Cherry Cotton Mills v. United States*, 327 U.S. 536, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946). There, it permitted money owed to a debtor in back taxes by the Department of the Treasury to be used to offset a defaulted loan owed by the debtor to the Reconstruction Finance Corporation. *Id.* at 538, 66 S.Ct. at 729. For purposes of setoff, the Court held that all agencies of the United States government are treated as one unit. *Id.* at 539, 66 S.Ct. at 730." (Emphasis added).

---

[6] See e.g.: *Beloff v. Commissioner*, 996 F.2d 607 (2nd Cir. 1993); *In re Shortt*, 277 B.R. 683 (Bankr. N.D. Tex. 2002); *In re Jones*, Bkrtcy.M.D.Ga.2006, 359 B.R. 837; *Fulgoni v. United States*, 23 Cl. Ct. 119, 126 (1991) (where IRS used an overpayment to pay off assessed interest and penalty, the court held "[t]here is no express statutory requirement that the IRS make notice and demand for payment upon the taxpayer before collecting unpaid tax by administrative offset"); *In re Donley*, 242 F. Supp. 403, 407 (E.D. Mo. 1965) ("...a penalty, and interest, are embraced within the phrase 'any liability in respect of an internal revenue tax', as found in Section 6402 (a))

[7] *In re Shortt*, 277 B.R. 683, 690–91 (Bankr. N.D. Tex. 2002) citing e.g., *United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir.1998); *HAL, Inc. v. United States (In re HAL, Inc.)*, 122 F.3d 851, 853 (9th Cir.1997); Turner v. SBA (In re Turner), 84 F.3d 1294, 1299 (10th Cir.1996).

*In re Hal, Inc.*, 122 F.3d 851, 853 (9th Cir. 1997).  With this unitary setoff principle in mind, it is understandable why courts are so willing to recognize the operation of setoff in the event a tax underpayment and overpayment occur in the same period.  Put simply, all the money goes to the same place – "a single governmental unit."[8] Thus, the impact on the government from a taxpayer's underpayment in the same period as an overpayment, in the same amount, is negligible and should trigger only the setoff procedure to take place, not the filing of a criminal indictment.

Mr. Hamdan and Mr. Mousa acknowledge that 26 U.S.C. 7202, and 7203, criminalize the willful failure to collect and pay over employment taxes.  However, they are unaware of, and unable to find, a single criminal case filed against a taxpayer, who owed no tax and was actually entitled to a credit and payback, let alone one that resulted in a conviction.  On the other hand, there are numerous civil cases wherein taxpayers were simply assessed civil penalties for the failure to pay employment taxes,[9] and even cases in which a setoff shielded the taxpayer from the assessment of civil penalties.

For instance, in *Emery Celli Cuti Brinckerhoff & Abady, P.C. v. Comm'r of Internal Revenue*, 115 T.C.M. (CCH) 1267, 2018 WL 1936122 (T.C. 2018), a corporate taxpayer sought

---

[8] *In re Short*, 277 B.R. 683, 690–91 (Bankr. N.D. Tex. 2002) ("for purposes of setoff under § 553, the agencies of the United States constitute a single 'governmental unit ...,' "). That *In re Shortt* occurred in the bankruptcy context does not distinguish it from the setoff at issue here. See*: In re Hal, Inc.*, 122 F.3d 851, 852 (9th Cir. 1997) providing:

> The Bankruptcy Code does not create a right to setoff; it merely preserves the right already given in a nonbankruptcy context. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). If a party is generally entitled to setoff in the nonbankruptcy context, it is entitled to one under the Bankruptcy Code.

[9] See e.g.: *East Wind Industries, Inc. v. U.S.*, 196 F.3d 499 (1999) (where taxpayers were assessed penalties for failure to pay employment taxes, but Third Circuit found taxpayers had reasonable cause for their nonpayment of trust fund taxes, and were thus entitled to abatement of penalties); *Q.E.D., Inc. v. U.S.*, 55 Fed.Cl. 140 (2003) (where corporate taxpayer filed suit against the United States to recover penalties imposed by the Internal Revenue Service (IRS) and government filed counterclaim seeking penalties for unpaid employment taxes that were assessed against plaintiff, court held no reasonable cause for failure to pay taxes); *Custom Stairs & Trim, Ltd., Inc. v. C.I.R.*, T.C. Memo. 2011-155 (2011), 102 T.C.M. (CCH) 1, 2011 WL 2636260 (T.C. 2011); *Stevens Technologies, Inc. v. C.I.R.*, T.C. Memo. 2014-13 (2014)

review of the IRS's determination to sustain proposed levy to collect unpaid employment tax, interest, additions to tax, and penalties for the failure to pay employment taxes during the first quarter of 1999. Specifically, Emery PC's employment tax deposits had been remitted under the Employer Identification Number of another entity, Emery LLP, which had previously been the entity through which the law firm conducted its operations.  The result was that Emery PC had failed to pay employment taxes for that quarter, but Emery LLP had overpaid employment taxes in the same amount.  The tax court found that Emery PC established a claim to setoff the underpayment by crediting it against the overpayment.  However, that claim was time barred by the expiration of the period of limitations provided in Section 6511. As such, Emery PC sought to rely on the doctrine of equitable recoupment, which the tax court described, as follows:

> As a general rule, the party claiming the benefit of an equitable recoupment defense must establish that it applies. See Menard, Inc. v. Commissioner, 130 T.C. at 62; Estate of Mueller v. Commissioner, 101 T.C. 551, 556 (1993). To establish that equitable recoupment applies, a party must establish the following elements: (1) the overpayment or deficiency for which recoupment is sought by way of offset is barred by an expired period of limitations; (2) the time-barred [*19] overpayment or deficiency arose out of the same transaction, item, or taxable event as the overpayment or deficiency before the Court; (3) the transaction, item, or taxable event has been inconsistently subjected to two taxes; and (4) if the transaction, item, or taxable event involves two or more taxpayers, there is sufficient identity of interest between the taxpayers subject to the two taxes that the taxpayers should be treated as one. See Dalm, 494 U.S. at 604–605; Menard, Inc. v. Commissioner, 130 T.C. at 62–63; Estate of Branson v. Commissioner, 113 T.C. 6, 15 (1999), aff'd, 264 F.3d 904 (9th Cir. 2001).  (Emphasis added.)  Id., at Page 5.

After considering these elements, the Tax Court found that *Emery PC* established the existence of a time-barred overpayment of employment taxes, as required for the taxpayer to receive an offset under the equitable recoupment doctrine, holding:

> We conclude, on the basis of all the facts and circumstances, that Emery PC exercised ordinary business care and prudence to ensure that a Form 941 for [*33] 1Q 1999 was timely filed and its employment taxes were paid. The paramount factor in this case is that a return was timely filed and the employment taxes were timely paid with respect to the wages at issue, albeit under an incorrect EIN. In

these circumstances we hold that Emery PC's failure to timely file a Form 941, pay the tax reported thereon, and deposit its employment taxes for 1Q 1999 was due to reasonable cause and not willful neglect. Accordingly, Emery PC is entitled to abatement of the section 6651(a)(1) and (2) additions to tax and the section 6656(a) penalty that respondent assessed and now seeks to collect. *Id.,* at Page 10.

The *Emery* case is instructive for the present case, as it shows that a taxpayer's entitlement to a setoff, when available, shields the taxpayer from penalties and other legal consequences sought by the government as a result of a tax deficiency, even though a formal claim for credit or refund was not made timely.

The *Emery* Court also explained how cases involving a taxpayer's failure to pay employment taxes are typically treated, and demonstrates that there are very adequate procedural devices the IRS has at its disposal to collect employment tax losses, none of which involve criminal recourse:

> Section 6331(a) authorizes the Secretary to levy upon the property and property rights of any person liable for taxes (taxpayer) who fails to pay those taxes within 10 days after notice and demand for payment is made. Section 6331(d) and section 6330(a) together provide that the levy authorized in section 6331(a) may be made with respect to any unpaid tax only if the Secretary has given written notice to the taxpayer 30 days before levy of the amount of the unpaid tax and of the taxpayer's right to a hearing.

Most importantly, and consistent with *Emery, supra*, "the doctrine of setoff, whether legal or equitable, is essentially a doctrine of equity, based on the principle that natural justice and equity require that the demands of parties mutually indebted be setoff against each other and only the balance recovered." *In re Braniff Airways, Inc.*, 42 B.R. 443, 449 (Bankr. N.D. Tex. 1984); 20 AM.JUR.2d Counterclaim, Recoupment, and Setoff §§ 7, 75.In the present case, arguably, Mr. Hamdan and Mr. Mousa do not necessarily have to rely on the doctrine of equitable recoupment, as their equitable right to setoff is not time-barred, as previously discussed. See: *Missouri Pub. Serv. Co. v. United States*, 245 F. Supp. 954, 961 (W.D. Mo. 1965), aff'd, 370 F.2d 971, (8th Cir.

1967) ("Both government and individual taxpayer have legal right to raise a setoff against each other without having to appeal to court's discretion or to evaluation of particular equities.")

Based on the above authorities, there are multiple grounds for a statutory and/or justifiable setoff, offset or credit, by operation of law, for the $5,222,675, amount of overpayments during the period of the Indictment, against all tax losses and underpayments claimed by the government in the Indictment, assumed to be $3,419,539. The above authorities require it, and the jurisprudential grounds of equity, equitable recoupment (*Emery, supra*, and *Ray Braniff, supra*), and fundamental fairness, demand it. There is no defense, shield and bar under 26 U.S.C. 6511, to such offset for failure to file for a refund. Even if a claim for a refund has expired, the equitable principles requiring the offset survive without limitation.

In addition to the legal and equitable entitlement for the credit and offset, Mr. Hamdan did, in fact, consent, along with the IRS, to extend the time for his tax assessments, with the execution of a Form 872, "Consent to Extend the Time to Assess Tax," for the year 2014, which operated to extend the time requirements in 26 U.S.C. 6511, and may apply to preceding years under this form, both legally and equitably. "Additionally, this agreement extends the period of limitations for assessing any tax (including penalties, additions to tax and interest) relating to any amounts carried over from the taxable year specified in paragraph (1) to any other taxable year(s)." (Form 872, Paragraph 4.)

## II.    The Government Cannot, as a Matter of Law, Establish that Mr. Hamdan and Mr. Mousa Willfully Conspired to Unjustly Enrich Themselves and Others

As a result of Mr. Hamdan's overpayment and resulting statutory and equitable rights to setoff, the government cannot establish the intent elements required for the tax offenses charged in the Indictment against Mr. Hamdan and Mr. Mousa.

Federal courts have consistently held that federal criminal tax offenses require the government to prove criminal "willfulness," to satisfy the element of specific intent . In this case, the Indictment alleges "the purpose and object of the conspiracy was for the defendants and co-conspirators to unjustly enrich themselves and others by under-reporting wages paid to employees of Brothers Food Mart and to avoid the assessment and payment of employment taxes…" (Id., at Page 9) (emphasis added). The government's ability to demonstrate the requisite element of "willfulness" is vitiated by evidence that Mr. Hamdan voluntarily overpaid his income taxes to such an extent that the government actually owes him a substantial refund. It is not possible to show that Mr. Hamdan and Mr. Mousa "voluntarily and intentionally" evaded a known duty by Brothers Petroleum to pay employment taxes when the evidence clearly shows that Mr. Hamdan voluntarily overpaid his income taxes, by treating the cash payments to workers as owners' distributions, and, thus, having the payments taxed at Mr. Hamdan's much higher individual tax rate (as compared to the individual tax rates of the managers and employees to whom cash payments were made).

III.   **The Government Should Be Estopped From Pursuing Counts 2 through 72 Because Any Conviction Therefrom Would Violate Mr. Hamdan's and Mr. Mousa's Constitutional Rights and Principles of Equity and Fairness**

By enacting the statutes discussed above, the government has assured the taxpayer, who underpays one tax, but overpays another, that his overpayment will exonerate him "against any liability in respect of an internal revenue tax." 26 U.S.C. § 6402. Those same laws also guarantee this taxpayer compensation in the event a balance remains after the underpayment is satisfied. In the instant case, Mr. Hamdan and Mr. Mousa have shown unequivocally they belong to that class of taxpayers who is entitled to both setoff and refund. As such, the Internal Revenue Code assured them protection, and even compensation, under 26 U.S.C. §§ 6402 and 6511. In direct

contravention of these laws, the government now seeks to hold Mr. Hamdan and Mr. Mousa criminally responsible for the same conduct for which the government previously assured them the promise of protection and compensation under the law.  The doctrine of equitable estoppel applies against the government in cases like this where the government misrepresents to an individual that he will not be punished for certain conduct, but then seeks to punish that individual for engaging in that same conduct.  Federal courts, including the Supreme Court, have held that such actions violate the individual's due process rights and rights to due a fair trial and effective assistance of counsel, under the Fifth and Sixth Amendments of the Constitution.

A good illustration of the doctrine of equitable estoppel occurred in *Cox v. State of La.*, 85 S.Ct. 476 (1965).  In that case, a city's police officials told a group of African American protesters led by the defendant that they could hold a demonstration across the street from a courthouse, 101 feet from courthouse steps, but could not meet any closer, based on a Louisiana statute prohibiting picketing "near" state court building. See: LSA-R.S. 14:401.  "In effect, appellant was advised that a demonstration at the place it was held would not be one 'near' the courthouse within the terms of the statute." *Supra* at 571.  In accordance with police instructions, the protestors assembled along a sidewalk 101 feet away from the courthouse.  After defendant spoke to the protestors, police officials ordered the crowd to disperse.  Based on defendant's refusal to obey the order, he was arrested and convicted of "disturbing the peace" and "obstructing a public passage". *Supra* at 478. The State contended that its order to disperse somehow removed the prior grant of permission. The Supreme Court rejected the State's argument, holding that any resulting conviction under these circumstances constitutes a violation of Due Process:

> …under all the circumstances of this case, after the public officials acted as they did, to sustain appellant's later conviction for demonstrating where they told him he could 'would be to sanction *an indefensible sort of entrapment by the State*— convicting a citizen for exercising a privilege which the State had clearly told him

was available to him.' Id., at 426, 79 S.Ct., at 1260. *The Due Process Clause does not permit convictions to be obtained under such circumstances. Supra at 484 (emphasis added).*

The Fifth Circuit has observed, "[i]t is well settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate caution, may be invoked against the United States *in cases involving internal revenue taxation.*"[10]   When the IRS challenged the Fifth Circuit's observation in *Fredericks v. Comm'r*, 126 F.3d 433, 435 (3d Cir. 1997), the Third Circuit took the IRS to task, citing some sixteen cases where the doctrine had been applied against the IRS specifically in tax cases and noted other cases in which the doctrine had been applied against other federal agencies:

> The Supreme Court has not directly met the issue whether estoppel against the IRS may be appropriate in certain circumstances. However, contrary to counsel for the Commissioner's emphatic statement at oral argument that in no case has estoppel been asserted successfully against the IRS, this court and others have applied the doctrine of estoppel to the IRS under various circumstances. In *Walsonavich v. United States,* 335 F.2d 96 (3d Cir.1964), we held that the IRS was estopped from asserting the statute of limitations as a defense to a taxpayer's claim for a refund where the government and taxpayer had entered a written agreement extending the statute of limitations. *See also Miller v. United States,* 500 F.2d 1007 (2d Cir.1974) (IRS estopped from relying on a statute of limitations contained in a previously signed waiver-of-notice form as a bar to taxpayer's refund claim, where the IRS had erroneously disregarded the waiver, unnecessarily issued the notice to taxpayer and, pursuant to the notice, the statute of limitations had not run); *Staten Island Hygeia Ice & Cold Storage Co. v. United States,* 85 F.2d 68 (2d Cir.1936) (equitable relief available against IRS where erroneous advice induced taxpayer to enter agreement with IRS waiving future claims for refund); *Schuster v. Commissioner,* 312 F.2d 311 (9th Cir.1962) (IRS estopped from correcting prior erroneous determination of estate tax where bank relied on that determination and disposed of the affected assets); *Time Oil Co. v. Commissioner,* 258 F.2d 237 (9th Cir.1958) (IRS estopped from recouping tax advantages obtained by employer where default was in part triggered by Commissioner); *United States v. Brown,* 86 F.2d 798, 799 (6th Cir.1936) (IRS, after exercising choice to pursue one of two available remedies while letting alternative theory "slumber in the files," is bound by that choice and cannot later pursue the inconsistent alternative remedy); *Woodworth v. Kales,* 26 F.2d 178 (6th Cir.1928) (avoiding direct estoppel ruling, but holding that Commissioner and his successors cannot reopen, reconsider and assess taxpayer's return—even within the statute

---

[10] *Simmons v. United States*, 308 F.2d 938, 945 (5th Cir. 1962) citing *Joseph Eichelberger & Co. v. Commissioner*, 5 Cir., 1937, 88 F.2d 874 (5th Cir., 1937); *Perkins et al. v. Thomas, Collector*, 86 F.2d 954 (5 Cir., 1937), affirmed, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324. And cf. *Stockstrom v. Commissioner*, 1951, 88 U.S.App.D.C. 286, 190 F.2d 283, 30 A.L.R.2d 443 (emphasis added).

of limitations period—once an initial valuation of certain stock had been made and indirectly confirmed by two subsequent commissioners); [Remaining citations omitted]

*     *     *

The IRS is not the only federal agency against which courts have applied the doctrine of estoppel. Case law demonstrates that courts have invoked estoppel against the Post Office Department, the Department of Housing and Urban Development, the Land Management Office, the Postal Service, the Parole Commission, the Farmer's Home Administration, the War Department, the Department of Interior, the Department of Commerce and Labor and the General Land Office.[3] **This plethora of precedent suggests that "[i]t is well settled that the doctrine of equitable estoppel, in proper circumstances, and with appropriate caution, may be invoked against the United States in cases involving internal revenue taxation,"** and in a variety of other contexts. *Fredericks v. Comm'r, supra at* 447–48 (3d Cir. 1997) citing.*Simmons v. United States,* 308 F.2d 938, 945 (5th Cir.1962) (emphasis added).

As the Fifth Circuit has noted, "in order for equitable estoppel to apply, the party seeking estoppel must establish five things: (1) affirmative misconduct by the government, (2) that the government was aware of the relevant facts and (3) intended its act or omission to be acted upon, (4) that the party seeking estoppel had no knowledge of the relevant facts and (5) reasonably relied on the government's conduct and as a result of his reliance, suffered substantial injury." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 461 (5th Cir. 2015).

The "misconduct" in the present case is defined as the government's failure or refusal to apply and follow their own tax laws as described herein.  The first element of affirmative misconduct by the government is clearly met by the government's affirmative enactment of laws that expressly assure the taxpayer he may offset a tax underpayment with an overpayment, and thereby discharge "any liability."  26 U.S.C. §§ 6401, 6402 and 6511.  Historically, litigants in the Fifth Circuit have struggled with this element, because, as that Court noted, "to state a cause of action for estoppel against the government, a private party must allege more than mere negligence, delay, inaction, or failure to follow an internal agency guideline"[11] and "[a]ffirmative misconduct

---

[11] *Fano,* 806 F.2d at 1265; *see also Peacock v. U.S.,* 597 F.3d 654, 661 (5th Cir.2010) (where the United States did not realize that a doctor who had allegedly performed an operation negligently was not its employee for over a year, and upon discovering this information filed a successful

requires an affirmative misrepresentation or affirmative concealment of a material fact by the government."[12]  However, there is no such impediment in the instant case, as the government's representation here is not merely one of negligence, delay, inaction or a failure to follow an internal agency guideline, but rather one that required an affirmative act of Congress to be put into effect as well as presentment to the President before being published and disseminated to the public. Article 1, Section 7, Clause 2 of the United States Constitution sets forth the process required for a bill to become a law.[13]  "It plainly requires 'Every Bill' to be passed by both Houses of Congress and to be presented to the President for his approval." *United States v. Horner*, 769 F. App'x 528, 533 (10th Cir. 2019), cert. denied, No. 19-5157, 2019 WL 4923074 (U.S. Oct. 7, 2019). It cannot be disputed that such actions are affirmative acts taken by Congress. See: *Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n*, 673 F.2d 425, 466 (D.C. Cir. 1982) ("Congress (or one house) 'acts' for purposes of this provision when it *affirmatively* passes some bill, order, vote, or resolution that alters the substantive law…"); *Williams v. Office of Chief Judge of Cook Cty. Illinois*, 839 F.3d 617, 625 (7th Cir. 2016) (where the Court gave as an example of affirmative misconduct, a legislative enactment, providing: "The affirmative act must be made by the body itself, such as by a legislative enactment").

---

motion to dismiss plaintiff's claims against it, "[w]hile the length of time it took for this information to come to light was unreasonably long, this is not an indication of willful misconduct on the Government's part. Thus, the district court did not abuse its discretion in rejecting Peacock's argument that the Government should be judicially estopped from claiming that Dr. Warner was an independent contractor.").

12 Robertson-Dewar v. Holder, 646 F.3d 226, 229 (5th Cir. 2011) (internal marks omitted) (quoting *Linkous v. U.S.,* 142 F.3d 271, 278 (5th Cir.1998)); *Moosa v. I.N.S.,* 171 F.3d 994, 1004 (5th Cir.1999) (internal marks omitted) (quoting *Linkous,* 142 F.3d at 278)).

13 U.S. Const. art. I, § 7, cl. 2 provides, in pertinent part:
  Every Bill which shall have passed the House of Representatives and the Senate, shall, before it
  become a Law, be presented to the President of the United States; If he approve he shall sign it,
  but if not he shall return it, with his Objections to that House in which it shall have originated,
  who shall enter the Objections at large on their Journal, and proceed to reconsider it…

Like the affirmative act of the police officials in *Cox, supra,* wherein they advised protestors that a demonstration at that location would not be one 'near' the courthouse within the terms of that state statute, the government here assured taxpayers, such as Mr. Hamdan and Mr. Mousa, that they could safely use any overpayment to offset an underpayment made within the same tax period.   In both cases, the government's representations, although not inherently inaccurate, later become so by virtue of the government's subsequent change in position to seek punitive action.   As the *Cox* Court put it, convictions against Defendants in these circumstances "would be to sanction an indefensible sort of entrapment by the State." *Supra* at 571.

The second element, that the government was aware of the relevant facts, is also clearly met.   As discussed, prior to the filing of the Indictment, counsel for Mr. Hamdan, on numerous occasions, by letter and in discussions, notified the government of Mr. Hamdan's overpayment of taxes, and the amounts of credits and offsets due as a result.   Counsel has also provided documentary evidence and given the government free access to Defendants' CPA to explain when, where and how the overpayment took place.   In response, the government was unable, or unwilling, to produce evidence to contradict or call these facts into question. But, rather than accept the weakness of its case, and turn its attention to a case where the government actually sustained a tax loss, the government proceeded with the filing of its Indictments with full knowledge of Mr. Hamdan's overpayment.

The third element, that the government intended its act or omission to be acted upon, is also clearly met.   This element should go without saying, since the government's representation here literally required an act of Congress to bring the setoff laws into effect.   If Congress did not intend for the laws to be acted on, why would it go to trouble of drafting, revising, then voting on the bill, then presenting it to the President for passage into law? It cannot be disputed that Congress

intended for a person in Mr. Hamdan's alleged position, *i.e.* one who has substantially overpaid his one tax, but underpaid another, to be able to use his overpayment to setoff any underpayment that might exist.

Similarly, the fourth and fifth elements, that (4) the party seeking estoppel had no knowledge of the relevant facts and (5) reasonably relied on the government's conduct and as a result of his reliance, suffered substantial injury, are both clearly met and will be addressed together, since they make up the "reliance" element of the doctrine. See: *Fredericks v. Comm'r*, 126 F.3d 433, 442 (3d Cir. 1997). Courts have sustained this "reliance" element in circumstances similar to those at bar where a defendant relied on the government's declaration of law or regulations. For instance, in *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973), the partners of a ranch entered into Acreage Reserve and Conservation Reserve contracts with the United States. At that time, published regulations permitted the arrangement in question. As the Ninth Circuit noted, the agency's published regulations in effect at the time the contracts were entered into "did not preclude this type of arrangement" and "arguably permitted this type of arrangement". *Id.,* at 987 and 981. However, the regulations were subsequently amended to explicitly disapprove the leasing of partnership land by partners as a means of avoiding the Soil Bank maximum payment limitations. Based, in part, on the regulations' previous approval of this arrangement, the Court held:

> At the time the partners entered into the contracts, even the agency's published regulations arguably permitted this type of arrangement. Moreover, not only did the partners rely on the government's approval of their contracts but after 1958 the Ranch requested permission to terminate the contracts. At this time, the more complete regulations had been published and it was clear that the arrangement was improper, but the government never apprised the partnership of this, and in fact refused permission to terminate the agreements. *Supra* at 985.

20

The instant case is closely analogous to *Lazy FC Ranch, supra*.  Mr. Hamdan's CPA, who has been acting on Mr. Hamdan's behalf in the preparation of his taxes roughly since 2008, was aware of a taxpayer's ability to claim setoff, and believed Mr. Hamdan could avail himself of that protection in the event he underpaid one tax, but overpaid another.  Although he had no knowledge of the "relevant facts" (*i.e.* the fourth element), he, nonetheless, relied on the government's express assurances of protection under the setoff law discussed above (*i.e.* the fifth element). Therefore, like the ranch partners in *Lazy FC Ranch*, who relied, in part, on regulations permitting the contractual arrangement in that case, Mr. Hamdan in the instant case, through his CPA, relied on setoff law for protection from both civil and criminal culpability in the event he underpaid one tax, but overpaid another in the same tax period.  However, the government misrepresentations in the instant case are even more egregious than those in *Lazy FC Ranch, supra*.  Unlike the regulations at issue in *Lazy FC Ranch, supra,* which were amended to support the government's change in position in that case, in the instant case, the law that permits setoff is still in effect.  Even after the overpayment was brought to the government's attention, the government buried its head in the sand with respect to its previous assurances about overpayments and continued to pursue criminal charges against Mr. Hamdan.  Applying *Cox, supra,* to the instant case, any conviction that results against Defendants, in these circumstances, will trample on Defendants' due process rights under the Fifth Amendment of the Constitution.

## IV.    The Doctrine of Unjust Enrichment Bars Prosecution of this Case

Defendants further contend that the doctrine of unjust enrichment shields them from any criminal responsibility, including restitution, sought by the government in this case.  Although typically asserted as a claim, rather than a defense, the principle of unjust enrichment is fitting as a defense under the unique circumstances of this case and Defendants are not aware of any law

21

that prohibits its use as a defense. Courts have recognized the government's right to use offset as a defense to prevent unjust enrichment in cases where the period of limitations for assessing taxes has long expired.  In *Bailey v. United States*, No. 122-77, 1997 WL 759654, at *75 (Fed. Cl. Sept. 30, 1997), the Federal Claims Court permitted the government to use offset as a defense to a taxpayer's claims for refund more than ten years after the plaintiff filed his claims and over twenty years from the actual tax years at issue in that case, providing:

> The right of allowing an offset under these situations is an equitable right given to the government based on the equitable principles and, as such, should not be abused. If properly used, it should provide the government with *a 'shield' to prevent the unjust enrichment* of a taxpayer, but if used as a 'sword' it would under certain circumstances have the contrary effect.

*Supra* at *74 (emphasis added).[14] Fundamental fairness and equity, therefore, demand that, if the government can assert offset as a defense to prevent unjust enrichment of the taxpayer, without regard to any period of limitations, then certainly a taxpayer would be afforded the same as a defense.  Applied to the instant case, any criminal conviction and/or restitution ordered against Defendants on Counts 2 through 72 would only contribute to the windfall received to date by the government and, thus, the principle of unjust enrichment prohibits such actions.

The United States District Court for the Eastern District of Louisiana, has held that the five elements required for a showing of unjust enrichment are: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and the impoverishment, (4) there must be an absence of justification or cause for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff. U.S. ex rel.

---

[14] See also: *Doko Farms v. United States,* 956 F.2d 1136 (Fed.Cir.1992); *Missouri Pac. R. Co. v. United States*, 338 F.2d 668, 672 (Ct. Cl. 1964)

T&C Dirtworks, Inc. v. L&S-CKY JV, No. CIV.A. 10-985, 2011 WL 1192944, at *5 (E.D. La. Mar. 28, 2011). The evidence previously discussed shows the government has been enriched by Mr. Hamdan's overpayment, and, conversely, served as an impoverishment to him. After an offset of any underpayment that might exist, the government would be enriched in the amount of $1,803,136 without any justification for keeping that sum of money. Furthermore, equitable relief under the principle of unjust enrichment is not subject to any period of limitations. See: *LW Constr. of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 301 (2018), which applies by analogy and in fairness, providing:

> As discussed above with regard to the futility of the government's proposed common law fraud counterclaim, the statute of limitations set forth in 28 U.S.C. § 2501 only applies to claims brought against the government, not to counterclaims brought by the government, such as the government's proposed unjust enrichment counterclaim. See Rhoades v. United States, 222 Ct. Cl. at 613; see also Dugan & McNamara, Inc. v. United States, 130 Ct. Cl. at 611, 124 F.Supp. at 652. Therefore, the statute of limitations set forth in 28 U.S.C. § 2501 does not apply to the government's proposed unjust enrichment counterclaim.

## <u>CONCLUSION</u>

How can the government prevail in seeking criminal responsibility for a tax underpayment when the evidence clearly shows an overpayment to the same agency of the government? The reality is that Mr. Hamdan's income tax overpayment, and resulting setoff to which he is entitled, foreclose the government's ability to show a willful failure on the part of Mr. Hamdan and Mr. Mousa, through Brothers Petroleum, to collect and pay over employment taxes that occurred during the same tax periods. That all agencies of the government constitute one governmental entity for purposes of setoff suggests that any tax underpayment in the same period as an overpayment has *de minimis* effect on the government and amounts to no more than an error in the labeling of different kinds of taxes. The setoff laws and principles of equity and fundamental fairness are available to protect taxpayers such as Defendants and apply in cases where a taxpayer's

actions, while arguably and technically incorrect, do not cause harm to the government. As such, this Court must apply these laws and order the dismissal of Counts 2 through 72 against Defendants.

Respectfully submitted,

CRULL, CASTAING & LILLY
Pan American Life Center
601 Poydras Street, Suite 2323
New Orleans, LA 70130
Telephone: (504) 581-7700
Facsimile: (504) 581-5523

BY: */s/ Edward J. Castaing, Jr.*
EDWARD J. CASTAING, JR. #4022
PETER CASTAING #35019
*ecastaing@cclhlaw.com*
*pcastaing@cclhlaw.com*

EPSTEIN BECKER GREEN
1227 25th Street NW
Washington, DC 20037
Telephone:  (202) 861-1868
*/s/ Richard Westling*
RICHARD WESTLING
*rwestling@ebglaw.com*

**Counsel for Imad Faiez Hamdan**

*/s/ Michael W. Magner*
MICHAEL W. MAGNER (#1206)
AVERY B. PARDEE (#31280)
Jones Walker LLP
201 St. Charles Avenue, Suite 5100
New Orleans, LA  70170
Telephone:  (504) 582-8316
*mmagner@joneswalker.com*
*apardee@joneswalker.com*

**Attorneys for Ziad Odeh Mousa**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served upon counsel of record by filing same in this Court's CM/ECF System this 15th day of November, 2019.

_/s/ Edward J. Castaing, Jr._